THE STATE OF NEW JERSEY, on the relation of the State
Board of Health,

v.

THE MAYOR AND ALDERMEN OF JERSEY CITY, THE MAYOR
AND COUNCIL OF THE CITY OF HOBOKEN, THE MOR-
RIS AND ESSEX RAILROAD COMPANY, THE DELA-
WARE, LACKAWANNA AND WESTERN RAILROAD COM-
PANY, EDLOW W. HARRISON, THEOPHILUS BUTTS and
MICHAEL T. CONNOLLY, commissioners.

1. In a bill to abate a nuisance, where it was alleged that a sewer, which
had been laid in the channel of a natural brook, carried not only ordinary
sewage, but "also the waters from the drainage area of the brook, * * *
which waters are corrupted by the mixing of sewage therewith," the phrase
"waters from the drainage area of the brook" means the waters which, if col-
lected naturally, would form the brook.

2. In a bill to abate a nuisance, it was alleged that Jersey City has under
its control a sewer which is the sole outlet for the drainage of a large district
of that city; that the sewer was laid in the channel of a natural brook down
in a ravine, and at first ended on the meadow lands in the city of H., only
slightly above the level of high water in the Hudson river; that the sewage
was "discharged at the foot of the ravine, close to the H. city line, and
created a public nuisance in the H. meadows;" that the sewer was afterwards
extended across the meadows and connected with another, emptying into the
H. river; that owing to the slight fall, in case of a heavy rain the water
could not escape through the extension sewer as fast as it came down the
ravine, causing the sewer to break and discharge the water and sewage on the
H. meadows in great quantity; that the cities had failed to take any action for
the proper drainage of the affected district, and that stagnant water was col-
lected and retained, constituting a nuisance dangerous to health.—Held, that
the bill showed a nuisance in the city of H., having a source outside its
limits, and hence within the act of May 24th, 1894, section 2, which, in such a
case, confers jurisdiction on the state board of health to intervene to abate the
nuisance.

3. A bill to abate a public nuisance caused by the discharge of sewage on
low lands in a city, where it was allowed to collect in stagnant pools, alleged
that the original outlet for the waters discharged from the sewer, as well as
for the surface waters of this part of the city, was, by a natural watercourse,
discharging into a cove of the Hudson river; that one of defendants, a rail-
way company, had constructed its road across this creek and extended the

State *v.* Jersey City.

shore line of the cove out into the river by filling for their yard; that the parties responsible for the nuisance were city officers, who had failed to keep certain sewers in repair, and defendant railway company, "who have filled up the ancient watercourse through which the surface water and the waters of the brook (in whose channel the sewer was constructed) were wont to pass in its natural flow."—*Held,* that the allegations were sufficient to hold the railway company in part liable for the nuisance.

4. Where a contract is made by commissioners who are acting in behalf and for the benefit of a city, the contract inures to the benefit of the city, and its authorities may enforce it, though the commissioners have fully discharged their office.

5. The act of May 24th, 1894 (*P. L. of 1894 p. 495 § 2; Gen. Stat. pp. 1646, 1647*), which authorizes the state board of health to intervene to abate a public nuisance within the territorial limits of a city, whenever such nuisance "shall have a source or origin outside of the limits," is constitutional.

Bill to restrain and abate a nuisance. On demurrer by the railroad companies.

*Mr. Charles L. Corbin,* for the complainant.

*Mr. Flavel McGee,* for the demurrants.

PITNEY, V. C.

The bill is filed under the second section of the act of May 24th, 1894. *P. L. of 1894 p. 495; Gen. Stat. pp. 1646, 1647.* It alleges the existence of a nuisance within the territorial jurisdiction of Hoboken, which has its origin within the territorial jurisdiction of Jersey City, and alleges and attempts to show that the Morris and Essex Railroad Company and the Delaware, Lackawanna and Western Railroad Company are in part responsible for its existence.

The railway companies have demurred. I shall refer to them as one company.

The location of the nuisance is the extreme southwesterly part of the city of Hoboken, in the low lands at the easterly foot of the Palisade bluff, just to the north of the easterly end of the tunnel of the railway company. No map is annexed to the bill, but, by consent of parties, a map of the *locus* was furnished to

the court as a part of the bill, and both parties relied upon the familiar general knowledge of the court and counsel of the geography and topography of the neighborhood.

The details of the nuisance are set forth as follows: That Jersey City has under the charge of its municipal government, as a part of its drainage system, a sewer called the "Ravine Road Sewer," which is the sole outlet for the drainage and sewage of about three hundred acres of that part of Jersey City lying on what is called the Heights and formerly a part of Hudson City, with a population of about thirty thousand. This sewer was constructed in the year 1870 or 1871, and ran down a steep ravine, which was the channel of a brook or stream called the Showhank brook, and, at first, ended and emptied on the low meadow lands in the westerly part of the city of Hoboken, which meadow lands are notoriously only slightly above the level of high water in the Hudson river, and about a mile distant therefrom; that this sewer carried not only ordinary sewage, but "also the waters from the drainage area of the brook partly in Jersey City and partly in the town of West Hoboken, which waters are corrupted by the mixing of sewage therewith."

I stop here to notice a criticism made by counsel of the railway company upon this language. He contends that it does not amount to an allegation that the natural waters of the brook are carried in the sewer, but only that the surface waters are carried therein. I cannot agree with him in this. The words "the brook" there used refer to Showhank brook, which has just been mentioned as being the name of the brook running through the channel in which the sewer was laid.

Now, it is common knowledge that when a district of country which lies at the headwaters of a small natural brook has been altered by the building of paved streets and sidewalks, and dwellings on each side, the result is, oftentimes, to very much diminish, if not entirely destroy, the natural springs which feed the brook, so that when rain falls, instead of soaking in the ground and forming reservoirs to supply the springs, it runs off immediately and rapidly. Such rain water is, nevertheless,

brook water, and properly styled the waters of the brook; so that the phrase "the waters from the drainage area of the brook" means the waters which, if collected naturally, would form the brook.

The bill proceeds to state that, as the town grew, the sewage discharged by this sewer increased and spread over the south-westerly part of Hoboken. The language used is, "discharged at the foot of the ravine, close to the Hoboken city line, and created a public nuisance in the Hoboken meadows." I think that that is a sufficient statement that it created a nuisance within the territorial limits of Hoboken.

The bill then proceeds to state that this nuisance became so great that legislation was had in 1875 (*P. L. of 1875, p. 621*), to provide for the continuation of the Ravine Road sewer in the city of Jersey City and the city of Hoboken, and commissioners were appointed to extend the ravine sewer and connect it with the sewers then existing in Jersey City; that, in pursuance of that act, the commissioners appointed under it constructed an extension of the Ravine Road sewer from its original terminus southerly across lands in the city of Hoboken to a street in Jersey City called Jersey avenue, then along Jersey avenue (southerly) until it crossed Thirteenth and Fourteenth streets, there connecting with sewers in those streets which had their outlet in the Hudson river. The map shows a sewer connecting with sewers in those streets and their connection with the Hudson river.

The bill alleges that this remedy proved inadequate; that the extension from the end of the ravine sewer at the foot of the bluff was nearly level, and the extension from there to the Hudson river was nearly level, so that in case of a heavy rain the water could not escape through the extension sewer as fast as it came down the steep slope, in the ravine, and the resulting pressure caused the sewer to break and deliver the water and sewage on "the Hoboken meadows and low lands" in great quantity, where it remained stagnant.

Criticism is made upon this language, but I understand it clearly to indicate the meadows and low lands in the city of

Hoboken lying near the foot of the slope and at the end of the Ravine Road sewer, as it was originally constructed, which point is a short distance north of the embankment of the railway company.

The bill then states that the nuisance thus created has been of a notorious character and has been recognized as a constant and growing injury to the health of the people of Hoboken and Jersey City, and that various attempts have been made to remedy it by legislation; that authority had been given to Jersey City to enlarge and rebuild the sewer and enter upon the streets of Hoboken for that purpose; that in 1890, by an act (*P. L. of 1890 p. 85*), the three defendants, Harrison, Butts and Connolly, were appointed commissioners to rebuild the sewer extension on lands wholly within the territory of Jersey City, and that several supplements have been passed giving them further and increased powers; that certain repairs have been made from time to time on the extension of the sewer by Jersey City and by Hoboken, but have been so unskillfully and inadequately made that the sewer has broken again under the pressure caused by heavy rains, and for several years no serious attempt has been made to abate the nuisance. In the meantime, a large and increasing population has occupied the territory in Jersey City, draining into this sewer, and many lateral sewers have been built by the authorities of Jersey City, connecting with it, and that it is the sole outlet for a population of thirty thousand people.

The bill then alleges that the municipal authorities of Jersey City and Hoboken, whose territories join near the foot of the hill, and thence to the Hudson river, have both failed and refused to take any action for the drainage of the territory affected by this nuisance, and have permitted the streets and adjoining lots to remain low and sunken and undrained, and the natural watercourse and outlet therefrom to be obstructed, so that stagnant pools of water are collected and retained, breeding disease and constituting a nuisance dangerous to health &c.

Now, it seems to me that this sets out a nuisance existing within the territorial limits of the city of Hoboken, and one

which has a source of origin outside of the limits of Hoboken. The case is thus brought within the second section of the statute of May 24th, 1894, and jurisdiction is conferred upon the state board of health to intervene in the manner they have.   In my judgment, it is not necessary that the source of the nuisance should be wholly in one jurisdiction and the nuisance itself wholly in another jurisdiction.   The act does not provide that *all* the sources or causes of the nuisance shall be in one jurisdiction and the nuisance itself *wholly* in another, but it says simply that " wherever any nuisance shall have *a* source or origin outside of the limits " &c.

No demurrer is filed by the city of Hoboken, and I think it plain that none would lie, because it is certain that in addition to the water and sewage which come down from Jersey City Heights, there is a certain quantity of water falling on the territory of Hoboken itself which must tend to increase and prolong the continuance of the nuisance after a rain ; and for the water falling upon its own territory, the city of Hoboken is of course responsible.   But it is not necessary to express a final opinion on that subject for reasons presently to be stated.

The bill next states the connection of the railway company with this nuisance.   It proceeds to state that " the ancient outlet for this part of the city of Hoboken [by which I understand it means the *natural* outlet] and for the waters of Showhank brook flowing through the ravine watercourse, was a *channel or creek discharging into Harsimus cove of the Hudson river.*" Now, criticism on this language was made by counsel for the railway company, to the effect that it does not say that this " channel or creek " was the outlet for the waters of this part of the city of Hoboken and for the waters of Showhank brook flowing through the ravine.   I think that criticism is put too high ; that we must supply, by construction, the words " waters of," in the first part of the sentence, and read it this way : " The ancient outlet for the waters of this part of the city of Hoboken and for the waters of Showhank brook flowing through the ravine watercourse," and that the whole sentence when read together means that Showhank brook reached the Hudson river

by a natural watercourse discharging into Harsimus cove, and that that natural watercourse also took off the waters which fell on that part of the city of Hoboken immediately adjoining it.

The point of the debouch of this "channel or creek" into Harsimus cove was, as stated by the bill, at a point in or near the present line of Henderson street, about three hundred feet south of Newark street, in Hoboken. That point is about half way from the mouth of the railway tunnel and the present docks or piers. The intermediate space has been filled in and used by the railway company as a terminus.

The line of the railway, from the mouth of the tunnel to the river, is nearly parallel with the line between Hoboken city and Jersey City, but the railway itself is located mainly within the limits of Jersey City, but its passenger station and passenger car-yard are mainly in Hoboken.

The bill proceeds to say that the Morris and Essex Railway Company constructed their railroad across this creek and extended the shore line (of the cove) out into the Hudson river by filling for their yard. Now it is argued that this language does not show any interference with the creek by the railway company, and that, so far as appears, that creek may still be open to the flow of water. But I cannot accept this criticism. Besides, we have, further on, this language:

"The parties responsible for this injury and nuisance are the mayor and aldermen of Jersey City, who have collected sewage and discharged the same at the foot of the ravine, and have neglected to keep the sewer in repair, and the Morris and Essex Railway Company and the Delaware and Lackawanna Railroad Company, its lessee, *who have filled up the ancient watercourse through which the surface water and the waters of the brook were wont to pass in its natural flow.*"

This is a distinct allegation that the watercourse had been filled up and obstructed by the railway company.

Now it seems to me that while it might be admitted, for the purposes of the argument, that the city of Jersey City would have no right, as against the riparian proprietors, to use the creek in its natural course as an outlet for its sewage (see *State* v. *Freeholders, 1 Dick. Ch. Rep. 173*), yet the complete oblitera-

State *v.* Jersey City.

tion of the creek and stoppage of all. flow of water through it, so that the waters naturally flowing through it are stopped and held back on the Hoboken meadows, does have the effect of aggravating and protracting the nuisance described in the previous part of the bill. This is a sufficient allegation to hold the railway company in part liable for the nuisance.

The bill then proceeds to state that the railway company, in 1868, entered into an agreement in writing (which is set out word for word in a schedule to the bill) with certain commissioners authorized to drain certain low lands lying in the city of Hoboken and the township of Weehawken, who founded their authority :upon "An act to provide for the drainage of certain low lands lying in the city of Hoboken, in the township of Weekawken," approved April 4th, 1866 (*P. L. of 1866 p. 941*), which agreement, after reciting that the commissioners had laid sewers and made ditches for the purpose of draining a certain portion of the low lands of Hoboken, up to and adjoining the lands of the railroad company in Hoboken, and that it was desirable that the drainage should be continued permanently over the lands owned and occupied by the railroad company in the city of Hoboken to the Hudson river, provided that the railroad company, in consideration of the sum of $1,216.25 to it paid, covenanted and agreed that they would make, keep and maintain a proper and sufficient opening for the drainage of the said low lands over and across the lands of the party of the second part to the sluice-gate as now erected, defining the size and character of the drain,

"and that they will keep said opening, sluiceway or drain in good repair and condition so as effectually to drain the said low lands from the sewers and drains as laid by the parties of the first part to the Hudson river."

Here it is to be observed that in the preamble it is recited that the commissioners had "*laid sewers*" and "*made ditches*" for the purpose of draining certain portions of the low lands, and the clause just recited declares that the railroad company shall keep the said opening, sluiceway or drain in good repair, so as effectually to "drain the said low lands from the *sewers* and

, *drains* as laid by the parties of the first part." Note that the words *sewers* and *ditches* are used in one place, and *sewers* and *drains* are used in another place. Now, I understand the distinction to be that sewers are closed or covered waterways, and ditches are drains which are or may be open and so arranged as to take surface water.

Now, it is argued that this language does not, by its proper force, provide for the taking of any surface water from the low lands. I cannot accede to that construction. I think it was intended to take water both from sewers proper and from open ditches or drains.

Then follows a provision in the agreement that the railroad company may change and remove the sluice-gate, but that it shall always maintain a proper opening from the sluice to the Hudson river or to some communication therewith, "so that the said ditches and sewers," as laid by the parties of the first part, "so long as they shall be kept up and maintained by the said parties of the first part," shall have free communication and outlet over and across said lands of the said parties of the second part to the Hudson river, so as to effectually drain the low lands first aforesaid. But then followed this provision:

"But this agreement shall only be binding on said parties of the second part so long as the said parties of the first part shall keep up and maintain the said sewers and drains so laid by them aforesaid."

Now, it is contended that there is no sufficient allegation in the bill that the sewage in question in the bill, or the lands in question, are those mentioned in the contract. I cannot agree to that contention. I think that the map and geography of the neighborhood show plainly that the waterway which the railroad company agreed to construct and maintain led directly from the low lands here in question. The drain which the agreement recited that the commissioners had created, ended near the lands of the railroad company; the map shows just where the low lands mentioned in the agreement are situate, and that they were located just at the place where the nuisance is alleged now to exist. As I have already said, the contract provides for the

State *v.* Jersey City.

carrying of surface water as well as sewage water proper, and, besides, it is common knowledge that ordinary sewers do carry surface water.

The bill then proceeds to state that the railroad company constructed a ditch in accordance with the provisions of the contract, and afterwards substituted an underground structure therefor, and that they have maintained imperfect outlets, and have not fully and adequately provided for the drainage, and have not kept a proper and sufficient opening for the drainage and sewers, as required by the contract, but have narrowed the channel and permitted it to become out of repair, and have obstructed the same in part by their filling and inadequate drainage pipes, and that the mayor and council of the city of Hoboken have negligently permitted the outlet to be so narrowed and partly changed, and have not enforced said contract against the railroad company.

The point of this last allegation is that the contract was made by commissioners who were acting in behalf and for the benefit of the city of Hoboken ; that, although those commissioners are now *functus officio*, yet that the contract inures to the benefit of the city of Hoboken, and the municipal authorities of that city have the right to enforce it, and that they have failed to do so. But I think that, so far as the railway company is concerned, the bill is faulty in not alleging that the conditions under which the continuance of the artificial watercourse was to be maintained, namely, the continued maintenance of the ditches and sewers in Hoboken, still continued.   There is a failure to allege that, and therefore the bill does not state with sufficient clearness and· explicitness any contractual default of the railroad company, and if the case against the railroad company rested upon that agreement only, I should be inclined to the opinion that the objection on that ground was fatal.

But the real object of the introduction of the agreement into the case was to show that the city of Hoboken was in part responsible for this nuisance, because it did not use the power which it had to relieve the place in question of such part, at least, of the waters there collecting as fell within its territorial

jurisdiction, and as the city has not demurred, I think that the allegation stands as against the city.

Undoubtedly, reading between the lines, and taking all the circumstances together, the inference is a fair one that this artificial channel which the railroad company agreed to maintain was a substitute for the natural watercourse through which the Showhank brook and the other waters falling on that part of Hoboken found their way to the river.

But the principal point made by the counsel of the railroad company, and urged with earnestness in various shapes, is that the object of the bill is either to compel a specific performance of the agreement or to provide a scheme for the drainage of this part of Hoboken over the lands of the railway company without paying for the land and thereby taking private property for public use without just compensation. But I think that neither of those matters is involved within the scope of the bill. The prayer of the bill is that the duties of the several defendants, with respect to the abatement of the nuisance, may be defined, and that they and their officers and agents may be decreed to perform such duties, and that they may be respectively enjoined from continuing the nuisance, and that the authorities of Jersey City may be enjoined from discharging sewage or water polluted therewith upon lots or streets in the territory of the city of Hoboken or any part thereof, and that the authorities of the city of Hoboken may be enjoined from maintaining pools of stagnant water on the lots and streets in the said city adjacent to the Ravine Road sewer terminus at or near the city line, and that the railroad company may be enjoined from obstructing the flow of the waters which have their ancient outlet across their lands, and that there may be other relief.

Now, I think that this statement of the prayer of the bill is in itself an answer to most of the very elaborate causes of demurrer set out in the pleadings and to much of the very able, learned and elaborate argument of the learned counsel of the railway company.

A vigorous attack, in argument, was made upon the constitutionality of the legislation which authorizes this suit. This

legislation has been before the court of errors and appeals several times ; once in *Hutchinson* v. *Board of Health, 12 Stew. Eq. 569*, where the decision below had been in favor of the board of health and against the appellant, and the appeal was argued for the appellants by the late Mr. Gummere, whose appearance on that side of the cause insured the taking of every possible point against the respondents, and the decree below was affirmed. Again, in *Butterfoss* v. *Lambertville, 13 Stew. Eq. 325*, where a decree against the defendant was also sustained. In none of these cases was it suggested that the legislation was unconstitutional, and I am unable to see the least ground for the contention. It is within the jurisdiction of this court to abate nuisances, and the question at the hearing will be whether the nuisance is thoroughly established, so that the complainant's right is not in doubt upon the facts, but for present purposes the nuisance is admitted. Neither can I see the least reason to doubt the power of the legislature to invest the several boards of health, whether state or local, with the power to act in behalf of the public to abate nuisances which are an injury to the health of the public at large.

The demurrer is overruled, with costs.